# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

JAMES CROAL and TERESA CROAL,

                Plaintiffs,

    v.

UNITED HEALTHCARE OF WISCONSIN, INC.,

                Involuntary Plaintiff,            Case No. 07-CV-837

    v.

CITY OF WAUKESHA,
CITY OF WAUKESHA POLICE DEPARTMENT,
OFFICER DAVID P. FEYEN,
OFFICER SCOTT S. CHRISTENSEN, and
OFFICER RONN K. GRACE.

                Defendants.

_____

# ORDER

On August 14, 2007, plaintiffs James and Teresa Croal filed suit against defendants in the Waukesha County Circuit Court. Plaintiffs' Complaint (Docket #1) includes state tort law claims, as well as federal claims based on 42 U.S.C. § 1983. Defendants removed the action to this court on September 19, 2007. On May 30, 2008, defendants filed a Motion for Summary Judgment (Docket #13). In response, plaintiffs filed a Brief in Opposition (Docket #27), in which they allege numerous instances of disputed material facts. Many of the disputed material facts find their primary or sole support in the Affidavit of Alexander Dgebuadze (Docket #30). Defendants filed a Motion to Strike (Docket #38) in which they request that the court strike certain portions of the Dgebuadze Affidavit, as well as the portions of plaintiffs'

Proposed Findings of Fact (Docket #27) that rely on the affidavit. For the reasons discussed below, the court is obliged to deny defendants' Motion to Strike and at the same time grants defendants summary judgment on most, but not all, of plaintiffs' claims.

## I.    MOTION TO STRIKE

### A.    Background

Shortly after 3:00 a.m. on Sunday, July 23, 2006, a citizen reported to the City of Waukesha Police Department that a car was being driven erratically through a Waukesha residential neighborhood. (Pls. Resp. DPFOF ¶ 20). Defendant Officer Feyen responded to the call and, based on the license plate given by the caller, identified the car as a black Audi parked in the driveway of plaintiffs' residence. (Id. ¶¶ 21-25). Officer Feyen parked along the curb near the residence, and approached plaintiff James Croal and Mr. Croal's son-in-law, Alex Dgebuadze, both of whom were still in the driveway after having just returned from Mr. Croal's surprise 75th birthday party. (Defs.' Resp. PPFOF ¶¶ 7, 9, 19-24). Officer Feyen asked Mr. Dgebuadze who had been driving the black Audi. (Pls. Resp. DPFOF ¶ 33). Officer Feyen was informed that the driver of that car was "Tim," who was already inside the house. (Id. ¶ 34). Tim Croal, James Croal's son, had driven the black Audi from the party to the Croal residence, and gone in to go to sleep. (Defs.' Resp. PPFOF ¶ 20).

Over the next several minutes, more officers, including defendant Officers Christensen and Grace, arrived on the scene, and Thomas Croal, another of James Croal's sons, came out of the residence and discussed the situation with the officers.

-2-

The situation escalated, and Officer Feyen arrested Thomas Croal for obstruction. (Pls. Resp. DPFOF ¶ 69-70). During the arrest, Officer Christensen deployed his Taser three times into Thomas Croal. (Id. ¶ 77). The situation further escalated as various family members came out of the Croal residence and protested the arrest and tasering of Thomas Croal. Thereafter, Officers Feyen and Grace forcefully took down and arrested Mr. Dgebuadze. (Defs. Resp. PPFOF ¶¶ 100-02). Plaintiffs, James and Teresa Croal, were standing near where Mr. Dgebuadze was arrested. (Id. ¶ 129). As Officer Feyen rushed to get to Mr. Dgebuadze, Officer Feyen knocked over James and Teresa Croal, and stepped on Teresa Croal's foot. (Id. ¶¶ 132-36). Officers Feyen and Grace entered plaintiffs' garage without permission during the arrest of Mr. Dgebuadze. (Id. 137-40).

Mr. Dgebuadze is an attorney who lives and works in California. (Sewell Decl., Ex. 10 at 6-7). As a result of his arrest, Mr. Dgebuadze was charged on July 27, 2006, with "Battery of a Peace Officer" (a Class H Felony), "Disorderly Conduct" (a Class B Misdemeanor), and "Resisting An Officer" (a Class A Misdemeanor). (Id., Ex. 1). His case was resolved on March 11, 2008, when he entered an "Alford plea"[1] to two counts of disorderly conduct (Id., Ex. 5), and was adjudicated guilty of those charges in the Waukesha County Circuit Court (Id., Ex. 4).

---

[1]"An Alford plea is a guilty plea in which the defendant pleads guilty while either maintaining his innocence or not admitting having committed the crime." *State v. Garcia*, 532 N.W.2d 111, 115 (Wis. 1995).

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 3 of 43   Document 51

### B. Discussion

Defendants seek to strike Mr. Dgebuadze's affidavit, as well as the portions of plaintiffs' proposed findings of fact that rely on his affidavit, on two separate grounds. Defendants' first contend that Mr. Dgebuadze's conviction on the disorderly conduct charge prevents plaintiffs from utilizing Mr. Dgebuadze's affidavit to challenge the existence of probable cause for his arrest. (Defs. Reply Br. Supp. Mot. S.J. at 4). The issue of whether the officers had probable cause to arrest Mr. Dgebuadze is central to plaintiffs' case, since it goes not only to whether or not the officers conducted an unlawful search by entering plaintiffs' garage without permission, but it also goes to the reasonableness of Officer Feyen's actions when he knocked down plaintiffs and stepped on Teresa Croal in effectuating the arrest of Mr. Dgebuadze. Defendants' further contend that Mr. Dgebuadze's affidavit should be struck on the basis of his having invoked his Fifth Amendment right against self-incrimination in response to almost all of defense counsel's questions during his deposition. (Id.). It is for these reasons that the defendants urge that the court strike Mr. Dgebuadze's affidavit, as well as plaintiffs' proposed findings of fact that rely upon the affidavit.

### 1. Effect of "Alford Plea"

Defendants rely on the Seventh Circuit's ruling in *Currier v. Baldridge*, 914 F.2d 993 (7th Cir. 1990) to support their contention that Mr. Dgebuadze's affidavit should be struck. In *Currier*, the Seventh Circuit stated that: "a plaintiff's previous conviction collaterally estops the plaintiff from reasserting a lack of probable cause."

-4-

914 F.2d at 996. The *Currier* court cited *Allen v. McCurry*, 449 U.S. 90 (1980) to support this maxim. However, in both *Currier* and *Allen*, the defendants did not plead guilty, but rather were convicted at trial. Though plaintiffs do not make this specific point, they do argue that Mr. Dgebuadze's entrance of an Alford plea is an important distinction, because Wisconsin law recognizes that "with an Alford plea, the defendant maintains an 'outright claim of innocence.'" (Pls. Opp. Br. Mot. Strike at 2) (*quoting State ex rel. Warren v. Schwarz*, 579 N.W.2d 698, 706 (Wis. 1998)). Defendants, however, maintain that "[i]n Wisconsin, Alford pleas require 'strong proof of guilt'" (Defs. Reply Supp. Mot. S.J. at 2) (*quoting Schwarz*, 579 N.W.2d at 712); and that "'[s]trong proof of guilt' requires 'that a sufficient factual basis was established at the plea proceeding to substantially negate [the] defendant's claim of innocence.'" (Defs. Reply Supp. Mot. S.J. at 3) (*quoting State v. Spears*, 433 N.W.2d 595, 598 (Wis. Ct. App. 1988)).

Plaintiffs' and defendants' arguments as to the effect of Mr. Dgebuadze's plea on plaintiffs' ability to challenge the existence of probable cause for Mr. Dgebuadze's arrest are relevant, but in the final analysis miss the mark. Defendants contend that the issue of probable cause has already been decided by a previous court, thus plaintiffs are collaterally estopped from re-litigating that issue; in other words, re-litigation of that issue is precluded. "Collateral estoppel," also known as "issue preclusion," is a doctrine that "addresses the effect of a prior judgment on the ability to re-litigate an identical issue of law or fact in a subsequent action." *Mrozek v. Intra Financial Corp.*, 699 N.W.2d 54, 61 (Wis. 2005). "In order for issue preclusion to

-5-

effectively limit subsequent litigation, the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and be necessary to the judgment." *Id.* Thus, while the parties spar over whether Mr. Dgebuadze's state court conviction relied upon a factual finding of probable cause, the more pertinent question to be addressed is whether the issue of probable cause was actually litigated. This is a question that is readily answered. Under Wisconsin law,[2] a guilty plea categorically does not satisfy the "actually litigated" requirement necessary for issue preclusion to apply. *Id.* at 62-64. Accordingly, plaintiffs are not precluded from litigating the issue of whether probable cause existed for Mr. Dgebuadze's arrest, because that issue was not actually litigated in the state court when Mr. Dgebuadze pled guilty, regardless of what factual findings the state court made. Thus, neither Mr. Dgebuadze's guilty plea, nor his conviction, provides sufficient reason to now strike his affidavit.

## 2. Effect of Mr. Dgebuadze Invoking the Fifth Amendment

Defendants also claim that, apart from the collateral estoppel issue, Mr. Dgebuadze's affidavit should be struck because he invoked his Fifth Amendment right not to answer questions that may tend to incriminate himself during his deposition in the instant case. The defense deposed Mr. Dgebuadze on January 29, 2008. (Defs. Mot. Strike ¶ 3). The defense subsequently deposed other witnesses.

---

[2]The "full faith and credit statute," 28 U.S.C. § 1738, dictates that federal courts may not "employ their own rules of res judicata in determining the effect of state judgments[;] [r]ather, it . . . commands a federal court to accept the rules chosen by the State from which the judgment is taken." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481-82 (1982). In the instant case, the "state from which judgment is taken" is Wisconsin.

Case 2:07-cv-00837-JPS    Filed 03/31/09    Page 6 of 43    Document 51

(Id.). It was only after discovery closed and defendants moved for summary judgment that Mr. Dgebuadze executed his affidavit. (Id.). Defendants claim that this was done to avoid discovery and so that Mr. Dgebuadze could tailor his affidavit to respond to defendants' summary judgment arguments after the close of discovery. (Id.). Defendants cite to the Second Circuit's opinion in *U.S. v. Certain Real Property and Premises Known As: 4003-4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 85 (2nd Cir. 1995) for the proposition that "if a litigant's request to waive the privilege comes at the 'eleventh hour' and appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation, the trial court may bar a litigant from testifying later about matters previously hidden from discovery through invocation of the privilege." (Defs. Reply Supp. Mot. S.J. at 5) (*citing* 55 F.3d at 85). Unfortunately, however, defendants fail to undertake the requisite factual examination necessary to demonstrate that either Mr. Dgebuadze or plaintiffs engaged in any type of manipulative behavior. Defendants cannot expect the court to simply accept defendants' conclusory statements as to Mr. Dgebuadze's motivation without more. Indeed, one of the principal cases defendants rely on, *S.E.C. v. Merrill Scott & Associates, Ltd.*, 505 F.Supp.2d 1193 (D.Utah 2007), states that "the court should examine how and when the privilege was invoked, how and when it was waived, the nature of the proceeding, and any resulting prejudice to the opposing party." *Id.* at 1209. In the instant case, such an examination reveals not only that Mr. Dgebuadze was not engaging in manipulative behavior, but that any prejudice suffered by defendants, if there indeed was any, was of their own making.

-7-

The relevant factual circumstances disclose the following: On July 27, 2006, Mr. Dgebuadze was charged with three offenses arising from his arrest at plaintiffs' home. One of those offenses was "Battery of a Peace Officer," a felony. As an attorney who resides in California, Mr. Dgebuadze faced significantly higher than normal stakes should he be convicted of a felony, including the possibility of serving jail time over a thousand miles from his home, not to mention the possibility of jeopardizing his license to practice law. Accordingly, Mr. Dgebuadze was extremely motivated to secure a disposition in his criminal case that would result in the felony charge being dropped. The State's recommendation to reduce the charges against Mr. Dgebuadze came only after the prosecutor conferred with Officer Feyen, pursuant to victim's rights notification requirements (because Officer Feyen was the victim of Mr. Dgebuadze's battery). (Sewell Decl., Ex. 5 at 12). Indeed, the prosecutor stated that the charges were only amended because Officer Feyen consented. (Id.). Mr. Dgebuadze pled guilty to and was convicted of the reduced charges on March 11, 2008 (Id., Ex. 4), approximately a month and a half after his January 29, 2008 deposition, and approximately two and a half months prior to the scheduled deadline for the close of discovery in this case.

Consideration of these facts demonstrates that Mr. Dgebuadze did not invoke the fifth amendment, and then later withdraw that invocation, in order to prejudice defendants' case. Mr. Dgebuadze was navigating his way through the criminal justice system while at the same time endeavoring to preserve his career. Though it was certainly reasonable for Officer Feyen to consent to the reduction of the

-8-

charges, so as not to jeopardize Mr. Dgebuadze's livelihood, Mr. Dgebuadze, as well as his criminal defense attorney, knew that if Mr. Dgebuadze were to give his version of the facts at his deposition in this case, doing so could possibly have lessened Officer Feyen's inclination to consent to the reduction in the pending charges. Given all that was at stake, invoking the Fifth Amendment was the only reasonable course of action for Mr. Dgebuadze, prior to the dismissal of the felony charge. However, after the reduction of the charges, and his conviction, Mr. Dgebuadze no longer had any reason to invoke the Fifth Amendment. Hence, the reasonable course of action for defendants would have been to take Mr. Dgebuadze's deposition after that date. In fact, Mr. Dgebuadze's criminal defense attorney even advised defendants' counsel, prior to the deposition, as well as at the deposition, that Mr. Dgebuadze would be available and willing to answer questions after his criminal matter was resolved. (Sewell Decl., Ex. 10, Dgebuadze Depo. at 15). Defendants offer no explanation for why Mr. Dgebuadze's deposition was not postponed until after the criminal matter was resolved, or why it was not retaken after that date. Moreover, the court notes parenthetically that on June 3, 2008, it entered an Order (Docket #24), pursuant to the parties' Stipulation (Docket #18), allowing plaintiffs additional time to conduct the deposition of Robert Willis. If defendants were unable to conduct the deposition of Mr. Dgebuadze during the two-month window of time after Mr. Dgebuadze's conviction and before the scheduled close of discovery, defendants could have similarly requested a reasonable extension of time. This court has routinely granted reasonable requests where the circumstances so warranted. Yet

every indication is that defendants made no effort to depose Mr. Dgebuadze following the resolution of his criminal case.  Therefore, the Motion to Strike (Docket #49) will be denied.

## II.    MOTION FOR SUMMARY JUDGMENT

The court's resolution of the Motion to Strike means  that plaintiffs may rely on Mr. Dgebuadze's affidavit in opposing defendants' summary judgment motion. Defendants have moved for summary judgment as to plaintiffs' first six claims.  Thus, the court must examine each of these claims to determine whether there are material questions of fact sufficient that a reasonable jury could find for plaintiffs. Plaintiffs set forth a total of seven claims in their complaint.  Those claims include: 1) Assault & Battery; 2) False Imprisonment; 3) Trespass; 4) Negligence; 5) Violations of the 4th and 14th Amendments; 6) Conspiracy; and 7) Punitive Damages.  Each of these claims arise from the same nexus of event, the arrest of Mr. Dgebuadze – specifically, the officers' contact with the plaintiffs during the arrest of Mr. Dgebuadze, as well as the officers' entry into plaintiffs' garage during the arrest of Mr. Dgebuadze.

### A.    Background

The parties have advanced very different versions of the facts pertaining to Mr. Dgebuadze's arrest.  "When things are in such a posture, courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 127 S.Ct. 1769, 1774 (U.S. 2007) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The

-10-

relevant facts, as articulated by plaintiffs, are as follows. After the arrest of Thomas Croal, Teresa Croal came out of the house and stood near her husband, James Croal, to find out what was happening. (Defs. Resp. PPFOF ¶¶ 119-123). Teresa and James Croal were standing on either side of their garage's pedestrian walk door. (Id. ¶ 124). An officer told Teresa and James Croal, "You get in the house. Get in the house. Get in the house or I [will] arrest you." (Id. ¶ 128). Officer Feyen told Mr. Dgebuadze, in response to Mr. Dgebuadze's questioning of the arrest of Thomas Croal, "You are obstructing justice!"[3] (Id. ¶¶ 90-92). Mr. Dgebuadze turned to walk into the garage through the pedestrian door. (Id. ¶¶ 95-96). No officer commanded Mr. Dgebuadze to stop. (Id. ¶ 98; Sewell Decl., Ex. 12, Teresa Croal Depo. at 42). No officer informed Mr. Dgebuadze that he was being arrested. (Defs. Resp. PPFOF ¶ 99). The officers had told all the family members, including Mr. Dgebuadze, to go into the house. (Thomsen Aff., Ex. 2, Graciela Croal Depo. at 18; Sewell Aff., Ex. 13, Teresa Murphy Depo. at 14). As Mr. Dgebuadze walked towards the house (intending to enter through the pedestrian walk door from the garage into the house), James and Teresa Croal turned to follow him into the home through the same entrance. (Defs. Resp. PPFOF ¶ 129). Officer Feyen rushed after Mr.

---

[3] It could be argued that upon hearing these words, Mr. Dgebuadze should have understood that he was going to be arrested, and he should have acted accordingly. However, it could also be argued – equally, if not more, convincingly – that Mr. Dgebuadze interpreted this statement as merely a variant of the same threat the officers were issuing to everyone else (whom they were not arresting). Certainly, when the officers were telling everyone, "get in the house or you will be arrested," they were essentially telling everyone "you are obstructing justice by being outside." Yet none of the other family members reasonably understood these threats to mean that any of them were about to be arrested, and thus they should stand still so as to facilitate that arrest. Thus, a jury could reasonably find that Mr. Dgebuadze could hear "you are obstructing justice" and interpret it as "get in the house or you will be arrested"; thus, justifying Mr. Dgebuadze's actions of turning to walk into the house, instead of staying put in order to be arrested.

-11-

Dgebuadze and forcefully grabbed him. (Id. ¶ 100). In his rush to get to Mr. Dgebuadze, Officer Feyen knocked James and Teresa Croal to the ground, and stepped on Teresa Croal's right foot, injuring it. (Id. ¶¶ 132, 136). Officer Feyen was not holding onto Mr. Dgebuadze when he knocked the Croals down or when he stepped on Teresa Croal's foot. (Id. ¶ 137-38). Officers Feyen and Grace entered the garage, without permission from a resident of the home or a warrant, and effectuated the arrest of Mr. Dgebuadze. (Id. ¶¶ 102, 139-140). During the arrest of Mr. Dgebuadze, an officer held Teresa Croal down with his hands, and told her to "stay down, stay down." (Id. ¶¶ 142-43). Thereafter, but before the arrest of Mr. Dgebuadze was completed, Teresa Croal got up, and she and her husband went into the house. (Sewell Decl., Ex. 12, Teresa Croal Depo. at 52).

### B. Discussion

#### 1. Summary Judgment Standard

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing

summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

### 2. Plaintiffs' First Claim: Assault & Battery

Plaintiffs claim that they were subjected to assault and battery when they were both knocked down and Teresa Croal was stepped on, and when Teresa Croal was held down by an officer. (Compl. ¶¶ 26-29). Though plaintiffs' complaint does not specify, the affidavits, depositions, and proposed findings of fact show that it is undisputed that Officer Feyen is the officer that knocked the Croals down and stepped on Teresa Croal's foot. (Defs. Resp. PPFOF ¶¶ 135-36). Despite a very thorough reading of plaintiffs' submissions, the court is unable to confirm which officer held Teresa Croal down. However, given that she was held down while Mr. Dgebuadze was being arrested, and that Officers Feyen and Grace were the two officers in the garage arresting Mr. Dgebuadze, and that Officer Christensen is the only other named officer, the court may reasonably infer that Officer Christensen is the officer who allegedly held Teresa Croal down.[4] Thus, it appears that this first claim is only asserted against Officers Feyen and Christensen.

"Under Wisconsin law a battery or assault and battery is a common law tort that has been defined as an intentional contact with another, which is unpermitted."

---

[4]Typically the court will not engage in such assumptions; however, given the court's ultimate ruling on the matter, the issue of which officer held down Teresa Croal is irrelevant.

-13-

*Estate of Thurman v. City of Milwaukee*, 197 F.Supp.2d 1141, 1151 (E.D. Wis. 2002) (*citing McCluskey v. Steinhorst*, 173 N.W.2d 148, 152 (Wis. 1970)). Generally, public employees are immune from acts within the scope of their public office when performing "discretionary acts," per Wis. Stat. § 893.80(4).[5] *Estate of Thurman*, 197 F.Supp.2d at 1151 (*citing Barillari v. City of Milwaukee*, 533 N.W.2d 759 (Wis. 1995)). However, Wisconsin recognizes four exceptions to the general rule of immunity articulated in § 893.80(4); one of those exceptions is actions that are "malicious, willful, and intentional." *Willow Creek Ranch, L.L.C. v. Town of Shelby*, 611 N.W.2d 693, 700 (Wis. 2000). "Malice" includes "reckless disregard of the law or of a person's legal rights." *Estate of Thurman*, 197 F.Supp.2d at 1151 (*quoting* Black's Law Dictionary 968 (7th ed. 1999)).

As to Officer Christensen, or whomever it is that plaintiffs allege held Teresa Croal on the ground, § 893.80(4) immunizes him from liability for assault and battery. Additionally, plaintiffs have not alleged sufficient facts such that a reasonable jury could find that he committed assault and battery. Teresa Croal testified at her deposition that she was not even cognizant that someone was holding her down, because she was too focused on what was going on inside the garage (the arrest of Mr. Dgebuadze). (Sewell Decl., Ex. 12, Teresa Croal Depo. at 33). Indeed, plaintiffs' claim that she was held down is based purely on the testimony of Graciela Croal and Teresa Murphy (Teresa Croal's sister and daughter, respectively), who

---

[5] Wis. Stat. § 893.80(4) "bars suits against public employees based on acts performed in the exercise of 'legislative, quasi-legislative, judicial or quasi-judicial functions.'" *Estate of Thurman*, 197 F.Supp.2d at 1151 (*quoting* Wis. Stat. § 893.80(4)).

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 14 of 43   Document 51

were both eye witnesses to the events that night. (Id.; Thomsen Aff., Ex. 2, Graciela Croal Depo. at 25, 37; Sewell Decl., Ex 13, Teresa Murphy Depo. at 50). Teresa Croal's testimony also establishes that she got up and went into the house before the arrest of Mr. Dgebuadze had concluded. (Sewell Decl., Ex. 12, Teresa Croal Depo. at 52). Thus, construing the facts in the light most favorable to plaintiffs, the most the court could find is that Officer Christensen held Teresa Croal down with his hands, so gently that she did not even feel it, for the first few moments of the arrest of Mr. Dgebuadze, which was taking place a few feet away, and which involved a commotion as well as the deployment of a Taser. Such action is not assault and battery. Rather, it is reasonable action under the circumstances. Even if it was misconstrued as a battery, Officer Christensen would clearly be afforded the protection provided by § 893.80(4), as plaintiffs have alleged no facts that could be considered as evidencing "malicious" actions on his part.

The same cannot necessarily be said for Officer Feyen's actions however. Whereas Officer Christensen's actions provide no basis for an inference of maliciousness so as to defeat immunity, Officer Feyen's actions, when viewed in the light most favorable to plaintiffs, do provide a basis for such an inference. Such facts, construed in favor of plaintiffs, are as follows. The officers were very aggressive and were yelling at Thomas Croal, asking to whom the black Audi belonged. (Thomsen Aff., Ex. 2, Graciela Croal Depo. at 16). Officer Feyen arrested Thomas Croal either without any justification, or on the thinnest of

-15-

pretenses.[6]  As soon as Officer Feyen got Thomas into the squad car, he turned his attentions to Mr. Dgebuadze, who had not been doing anything illegal.[7]  Mr. Dgebuadze attempted to go into the house, as the officers had been directing everyone to do.  Officer Feyen went after Mr. Dgebuadze without telling him to stop or that he was under arrest, thus Mr. Dgebuadze had no knowledge of his arrest until Officer Feyen made physical contact with him.  That physical contact did not occur until after Officer Feyen had knocked plaintiffs down (because they were between Mr. Dgebuadze and Officer Feyen), yet  Mr. Dgebuadze was already in the garage at the time plaintiffs were knocked over.

If these facts be true, then Officer Feyen had no probable cause to arrest Mr. Dgebuadze, nor did he have justification to enter into the Croal home, thus, he was not effectuating a proper arrest at the time he knocked over Mr. and Mrs. Croal. Additionally, a jury could find that Officer Feyen chose to push plaintiffs down out of anger or frustration as he attempted to make an unlawful arrest.  Plaintiffs' cite to *Estate of Thurman* to support their contention that these circumstances are sufficient enough that a jury could find the requisite intent to defeat immunity.  However, *Estate of Thurman* is not on point because, in that case, there was direct evidence

_____

[6]Officer Feyen had asked Thomas if the residence was his.  Thomas answered "no," understanding the question to be  whether Thomas owned the home and thus had authority to grant entrance to the officers. Sometime later, Officer Feyen asked to see Thomas's identification.  Thomas voluntarily showed it to him. The ID stated that Thomas lived at the residence.  Officer Feyen accused Thomas of lying to a police officer, and arrested Thomas.

[7]Defendants state that the reason for initiating the arrest of Mr. Dgebuadze was that he had been engaging in disorderly conduct.  However, several of plaintiffs' witnesses contradict that assertion.  (Sewell Aff., Ex. 11, James Croal Depo. at 21; Id., Ex. 12, Teresa Croal Depo. at 32; Thomsen Aff. Ex. 2, Graciela Croal Depo. at 35).

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 16 of 43   Document 51

of the defendant's intent. 197 F.Supp.2d at 1152 (defendant officer not entitled to summary judgment based on immunity because there was evidence of intent, specifically defendant telling his wife that he was going to chase down the thief in order "to beat him down some more."). However, the other case to which plaintiffs cite, *Teames v. Henry*, 2004 WL 2186549 (N.D. Tex. 2004), is much more applicable. In that case, the court held that a jury could infer the requisite intent to substantiate assault and battery claims against a defendant who pushed a plaintiff off her porch as the defendant struggled with plaintiff's husband nearby in an attempt to arrest him. *Id.* at 1, 6, 8. Drawing an inference in favor of plaintiffs in the instant case is more probable than in *Teames*, because in *Teames* there was no allegation that the officers were engaged in making an unlawful arrest, or that the officers had been behaving in a belligerent manner, as plaintiffs' witnesses attest in this case. Indeed, the allegation that Officer Feyen was making an unlawful arrest of Mr. Dgebuadze is of crucial importance to plaintiffs' assault and battery claim, though it is conceivable that a jury could infer malicious intent even if the arrest was lawful, if the jury felt that the decision to knock down two elderly individuals in order to arrest a man for disorderly conduct was completely unjustifiable. *See Crosley v. City of Pittsburg*, 2007 WL 4191932, 13 (N.D. Cal. 2007) (denying defendant officers' motion for summary judgment as to battery claim, where officer knocked down woman he knew was between him and a suspect he was attempting to arrest). While there may be some question as to whether a jury actually would find for

-17-

plaintiffs on this claim, there simply are too many material facts is dispute for the court to grant summary judgement on this claim as to Officer Feyen.

### 3. Plaintiffs' Second Claim: False Imprisonment

The Wisconsin Supreme Court has adopted the definition of false imprisonment given by the Restatement of Torts (Second) § 35 (1965), *Herbst v. Wuennenberg*, 266 N.W.2d 391, 394 (Wis. 1978), which states:

> (1) An actor is subject to liability to another for false imprisonment if
> (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and
> (b) his act directly or indirectly results in such a confinement of the other, and
> (c) the other is conscious of the confinement or is harmed by it.

Rest. 2d Torts § 35. Upon examination of this definition, it is clear that neither the actions of Officer Feyen (knocking plaintiffs down) nor the actions of Officer Christensen (commanding Teresa Croal to "stay down" as well as holding her down) amount to "false imprisonment." The claim against Officer Feyen fails on its face because there is no allegation that he confined either of plaintiffs within fixed boundaries. At worst, he shoved them down, stepped on Teresa Croal, and kept on moving. As Teresa Croal testified, her contact with Officer Feyen was over in an instant. (Sewell Decl., Ex. 12, Teresa Croal Depo. at 40). Even if Officer Feyen acted intentionally, his actions would not constitute false imprisonment. Similarly, Officer Christensen's actions – though of longer duration than Officer Feyen's, and though those actions did arguably confine Teresa Croal momentarily – would nonetheless not constitute false imprisonment. "The essence of false imprisonment

-18-

is the intentional, unlawful, and unconsented restraint by one person of the physical liberty of another." *Dupler v. Seubert*, 230 N.W.2d 626, 631 (Wis. 1975). As previously explained, Officer Christensen's actions, even construed in the light most favorable to plaintiff, could not be considered "unlawful." Furthermore, as previously stated, Teresa Croal was not conscious of the fact that Officer Christensen was holding her down, nor was she harmed by it. She was conscious that she was told to "stay down," but this would likely not meet the second prong of the false imprisonment test, because Teresa Croal testified that though she was told to stay down, she was not going anywhere anyway, (Sewell Decl., Ex. 12, Teresa Croal Depo. at 50), and that she was pinned in the corner by the commotion (not by any officer's intentional actions). (Id. at 40). Because plaintiffs have not alleged facts sufficient to support a finding of false imprisonment, summary judgment on the entirety of this claim will be entered for defendants.

### 4. Plaintiffs' Third Claim: Trespass

Plaintiffs assert a trespass claim against the defendant officers. The thrust of the claim is that though the officers were privileged to be on the property initially to investigate the erratic driving claim, once the officers learned that Tim Croal, the driver of the Audi, was not coming out, any privilege they had to be there expired. (Pls. Br. Opp. Mot. S.J. at 27 n.14). Defendants take the position they were still investigating the erratic driving claim and that, during their time there, the officers then encountered an obstruction of justice crime (Thomas Croal) and then a disorderly conduct crime (Mr. Dgebuadze). (Defs. Reply Supp. Mot. S.J. at 14).

-19-

They claim each of these subsequent alleged crimes further justified their continuing presence. (Id.).

"Trespass occurs when a person enters or remains upon land in the possession of another without privilege to do so." *Geyso v. Daly*, 691 N.W.2d 915, 918 (Wis. App. 2004). Typically, police officers are privileged to enter the land of another to make a lawful arrest. Rest. 2d Torts § 204. Contrary to plaintiffs' assertions, the defendant police officers were continuing with a reasonable investigation of the erratic driving claim at the time they arrested Thomas Croal. Plaintiffs assert defendants knew Tim Croal was not coming out, so the officers should have left, but there is no allegation that they had been told that Tim Croal was definitively not coming out. Additionally, Thomas Croal was still engaging with the officers. Had Thomas and the rest of the family members gone in the house and closed the door, the officers' investigation would have necessarily been over. However, as it happened, the officers were reasonable to think that their investigation was ongoing, especially since Thomas Croal told the officers he did not know what was going on, rather than that Tim refused to come out, and since James Croal, the owner of the home, never told the officers to leave. Thus, the officers were not trespassing when they arrested Thomas Croal. However, Officers Grace and Feyen may have indeed been trespassing when they entered plaintiffs' garage. As the court has already noted, a reasonable jury could find that they did not have probable cause. As for Officer Christensen, he did not initiate the arrest of Mr. Dgebuadze, he did not go into the garage, and he was on the property aiding his

-20-

fellow officers. So long as Officer Christensen had a good faith belief that Officers Feyen and Grace had probable cause to initiate the arrest of Mr. Dgebuadze, and as long as that belief was objectively reasonable, then Officer Christensen cannot be liable in trespass for actions in support of his fellow officers. *Pritz v. Hacket*, 440 F.Supp. 592, 598 (W.D.Wis. 1977). Though Officer Christensen did not know why Officer's Feyen and Grace were arresting Mr. Dgebuadze, it would be inappropriate for the court to impose a requirement that a police officer make an independent investigation prior to assisting fellow officers. Police officers must be able to in good faith rely on the assumption that their fellow officer's actions are warranted, and not be subjected to liability if it later turns out that those actions were not warranted. There is no evidence that Officer Christensen could have known that the arrest of Mr. Dgebuadze was unlawful (if indeed it was), and the court will not penalize Officer Christensen for reacting as though the arrest was lawful. Thus, the court will grant summary judgment on this claim as to Officer Christensen, but deny it as to Officers Grace and Feyen, but only on the issue of the entry into the garage, not their presence on the lawn and driveway, for there was never a clear indication that Tim Croal was not coming out, and the officers were reasonable to think that he may yet come out. Thus, they retained their privilege to investigate the erratic driving report.

### 5. Plaintiffs Fourth Claim: Negligence

Plaintiffs allege negligence against the individual officers, as well as the City of Waukesha Police Department. Both parties agree that pursuant to Wis. Stat. 893.80(4), defendants are generally immune from negligence claims. However, as

-21-

plaintiffs correctly point out, that immunity does not apply to ministerial duties. *Sheridan v. City of Janesville*, 474 N.W.2d 799, 801 (Wis. App. 1991). Effecting an arrest is not a ministerial duty though, it is discretionary. *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 932 (E.D.Wis. 1999). A ministerial duty is one that is "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Board of Regents of University Wisconsin System,* 240 N.W.2d 610, 622 (Wis. 1976). The alleged ministerial duty that the defendant officers violated, was the duty to document any injury that is sustained during an arrest.[8] (Pls. Br. Opp. Mot. S.J. at 29-30). Plaintiffs assert that "[c]ontrary to the mandate of the policy, there is no mention of the incident causing this injury to Teresa Croal, nor is there any explanation of the 'circumstances and the justification for the force used' in any of the officers' reports." (Id. at 30). This fact, as well as the fact that "no one at the Waukesha Police Department investigated or evaluated the conduct of the officers involved," means that, "[t]he jury is entitled to consider this for purposes of plaintiffs' negligence claims" – or so plaintiffs contend. (Id.).

---

[8]This duty arises from the City of Waukesha Police Department's "Use of Force Policy" which states in applicable part: "When force is used . . . and/or if an injury is sustained, the incident shall be documented in report form containing the circumstances and the justification for the force used." (Connolly Decl., Ex. 20 at 5).

-22-

Plaintiffs' negligence claim fails because even if the officers did violate a ministerial duty to document injuries, and even if the police department did violate a ministerial duty to investigate, neither of those violations caused the plaintiffs any harm. In Wisconsin, the third element of a negligence claim is "a causal connection between the defendant's breach of the duty of care and the plaintiff's injury." *Dyer v. Blackhawk Leather LLC*, 758 N.W.2d 167, 177 (Wis. App. 2008). Plaintiffs have not alleged, nor do any facts support, that defendants' supposed violations of ministerial duties had any causal connection with plaintiffs' injuries. Accordingly, defendants are entitled to summary judgement on plaintiffs' negligence claim in its entirety.

**6.    Plaintiffs' Fifth Claim: Violations of Civil Rights (42 U.S.C. § 1983)**

Title 42 U.S.C. § 1983 provides individuals a private right of action against persons who, under color of law, deprive an individual of any rights "secured by the Constitution and laws." Id. As the Supreme Court has oft noted, § 1983 "is not itself a source of substantive rights," rather it provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979). The federal rights plaintiffs allege were violated are: the right to be free from unreasonable search, the right to be free from unreasonable seizure, the right to be free from excessive force during a seizure – all three of these rights are conferred

-23-

by the Fourth Amendment[9] – and, lastly, substantive due process rights, conferred by the Fourteenth Amendment.

### a) Unreasonable Search:  Fourth Amendment

Plaintiffs assert that Officers Feyen and Grace's warrantless entry into their garage was a violation of plaintiffs' Fourth Amendment right to be "secure in their . . . house[] . . . against unreasonable searches."  Defendants proffer three arguments opposing plaintiffs' claim: 1) plaintiffs had no expectation of privacy in their garage; 2) the officers had probable cause to arrest Mr. Dgebuadze, and the arrest began outside the garage; and 3) exigent circumstances existed for Mr. Dgebuadze's arrest. As to the second argument, there are too many disputed facts as to Mr. Dgebuadze's behavior and as to where the arrest began for this court to make any findings on the matter at the summary judgement stage, thus, the court only briefly examines this argument.  The court does, however, examine the first and third arguments in depth.

### I) Plaintiff's Expectation of Privacy in Entry Area of Garage

Plaintiffs and defendants agree that an attached garage is within the curtilage of the home, and thus "entitled to the cloak of protection" that the Fourth Amendment "throw[s] over [the] house."  *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884-85 (9th Cir. 1990) (*quoted in* Pls. Br. Opp. Mot. S.J. at 3); see Defs.

---

[9]Technically, though the rights allegedly violated are found in the Fourth Amendment, these are in fact Fourteenth Amendment claims, as the Fourth Amendment "was incorporated against the states by the Fourteenth Amendment's Due Process Clause." *Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir. 1997) (*quoted in* Duran v. Sirgedas 240 Fed. Appx. 104, 109 n.3 (7th Cir. 2007)).  Yet, for the sake of simplicity, the court will refer to these as Fourth Amendment claims.

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 24 of 43   Document 51

Br. Supp. Mot. S.J. at 17 (*citing U.S. v. Carter*, 360 F.3d 1235, 1241-43 (10th Cir. 2004) (protections against unreasonable searches within a person's home are generally extended to areas within the home's curtilage, such as a nearby garage)). Defendants' contention is that plaintiffs were not entitled to privacy in their garage, not because it was a garage, but because the door to the garage was open, and the arrest took place just inside. Defendants cite *U.S. v. Santana, 427 U.S.* 38 (1976) to support their contention. In *Santana*, the Court held that a woman who was standing in the threshold of her doorway ("one step forward would have put her outside, one step backward would have put her in the vestibule of her residence," *Id.* at 40 n.1), was standing in a "public place." *Id.* at 42. The Court's rationale for finding the threshold to be a public place was the fact that while standing there the woman "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* Defendants, however, attempt to stretch *Santana* further than the Court's ruling will permit. Defendants claim that "[a]n officer's entry into a garage with an open door facing the street to make an arrest is no different than an officer's entry onto the doorstep of a house to make an arrest." (Defs. Br. Supp. Mot. S.J. at 17) (*citing Santana*, 427 U.S. at 42). Yet *Santana* itself shows that this assertion is incorrect. In *Santana*, the police arrived at the woman's home, found her in the threshold, identified themselves as police, and approached her in order to arrest her. 427 U.S. at 40. The woman attempted to retreat into the home, and the arrest actually took place a few feet inside the vestibule of the woman's home. *Id.* The

-25-

Court did not hold that the arrest in the vestibule (a few feet inside the home) took place in a public place (as defendants would have this court hold), but rather that the officers' warrantless entry into the home was allowable under the "hot pursuit" doctrine, as the chase began while the woman was in a public place (the threshold), and the officers already had probable cause to arrest her.[10] *Id.* at 43. Thus, defendants are incorrect in asserting that plaintiffs have no expectation of privacy in the area immediately inside the pedestrian garage door. Plaintiffs did have an expectation of privacy in that area, thus defendants' warrantless entry can only be justified if defendants were in "hot pursuit," as in *Santana*, or if there were other "exigent circumstances." *U.S. v. Lenoir*, 318 F.3d 725, 730 (2003).

### ii) There Was Probable Cause, and Arrest Began Outside

As detailed in the previous sections of this decision, plaintiffs have alleged, and supported with affidavit evidence, sufficient facts to dispute whether there was probable cause to arrest Mr. Dgebuadze, and where that arrest commenced. Plaintiffs dispute defendants' assertion that Officers Feyen and Grace ordered Mr. Dgebuadze to stop, and they dispute defendants' assertion that Officer Feyen made physical contact with Mr. Dgebuadze prior to Mr. Dgebuadze's entry into the garage. Certainly a jury could believe plaintiffs' version of the facts. Furthermore, it is less than clear what effect it would have even if defendants could show that the arrest began outside. See infra II(B)(6)(a)(iii).

---

[10]The woman had only moments earlier sold drugs, through an intermediary, to an undercover agent paying with marked bills. *Santana*, 427 U.S. at 39-40.

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 26 of 43   Document 51

### iii) Exigent Circumstances Justified the Warrantless Entry

Though "searches . . . inside a home without a warrant are presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586 (1980), and thus a violation of the Fourth Amendment, "[s]uch searches are permitted, however, when probable cause and exigent circumstances exist." *U.S. v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998) (*citing Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984)). "The Supreme Court has characterized the following situations as exigent circumstances: hot pursuit of a fleeing felon; to prevent the imminent destruction of evidence; to prevent a suspect's escape; or to address the risk of danger to the police or to other persons inside or outside the dwelling." *Lenoir*, 318 F.3d at 730 (*citing Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). It is the defendants' burden to establish that they had an objectively reasonable belief that exigent circumstances existed at the time of entry into plaintiffs' home. *Marshall*, 157 F.3d at 482. In determining whether exigent circumstances exist, the court must analyze the situation from the perspective of the officers at the scene. *Id.* However, contrary to defendants' assertions, this only means that the court should look at the undisputed facts from the officers' perspective, not that the court should resolve all factual disputes in the officers' favor.

In the instant case, defendants assert that two types of exigent circumstances existed to justify the warrantless entry of plaintiffs' home. Defendants assert that Officers Feyen and Grace were in "hot pursuit" of Mr. Dgebuadze, and defendants assert that entry was necessary to address the risk of danger to the police. If either

of these exigent circumstances did in fact exist, then plaintiffs' Fourth Amendment rights were not violated by the officers' entry into the garage, *so long as* the officers had probable cause to make the arrest. Probable cause is still required. *Marshall*, 157 F.3d at 481 (warrantless entry is not a Fourth Amendment violation "when probable cause *and* exigent circumstances exist.") (emphasis added).

"Hot pursuit" is essentially a police chase of some sort; "it need not be an extended hue and cry in and about (the) public streets." *Santana*, 427 U.S. at 42-43 (internal quotations omitted). Thus, a short chase of perhaps only a few steps would qualify as a "hot pursuit" so long as it commenced in a public place, and there was probable cause for the arrest. Defendants assert that the "hot pursuit" exception, therefore, applies in the instant case. However, even if defendants were correct that the arrest commenced outside the garage, defendants have not fully articulated why the "hot pursuit" exception should apply. Defendants cite *Santana* for the proposition that "a criminal suspect may not defeat a lawful arrest which has been set in motion in a public place simply by escaping to a private place." (Defs. Br. Supp. Mot. S.J. at 21). Certainly *Santana* does state as much. 427 U.S. at 42. Yet, *Santana* cannot be taken out of context. *Santana* dealt with the "hot pursuit" of a felony suspect. Indeed, the "hot pursuit" doctrine has been held to apply almost exclusively to instances of pursuit of those alleged to have committed a felony. *Welsh*, 466 U.S. at 750-52 (citing numerous cases therein). However, Officer Feyen initially sought to arrest Mr. Dgebuadze for "Disorderly Conduct" in violation of Wis. Stat. § 947.01, which is a Class B misdemeanor. Defendants have not cited any case law that

-28-

would support a finding that the "hot pursuit" doctrine would justify entry into plaintiffs' home to arrest Mr. Dgebuadze for a misdemeanor. Defendants have alleged that Mr. Dgebuadze attempted to, and did, punch Officer Feyen outside the garage. "Battery of a Peace Officer," Wis. Stat. § 940.20(2), is a felony and thus, if it occurred outside the garage, would trigger the "hot pursuit" exception for defendants' entry into the garage. Of course, plaintiffs dispute the fact that Mr. Dgebuadze tried to, or did, hit Officer Feyen. Thus the court cannot rule on summary judgment that the "hot pursuit" exception applies in this case.

Whether the "hot pursuit" exception applies or not will ultimately depend on factual findings made by the jury. In order to determine if the "hot pursuit" exception applies, the jury will have to determine whether the officers had probable cause to arrest Mr. Dgebuadze for a felony prior to their entry into the garage. That would leave the jury with having to decide whether Mr. Dgebuadze attempted to hit Officer Feyen outside the garage. Given the speed with which the incident occurred, and the conflicting narratives offered by the parties, the court finds that this issue is best left for jury determination. By the same token, the defendants have failed to support their contention that officers may enter a home in order to effect an arrest for a misdemeanor, even when that arrest commenced in a public place.[11] Even if the arrest did commence outside, Mr. Dgebuadze's attempts to evade arrest by entering the home did not constitute a felony pursuant to the "Resisting or Obstructing [an]

---

[11]Defendants cite only to *Santana* which, again, involved an arrest on felony charges.

Officer" statute, Wis. Stat. § 946.41, as this is merely a misdemeanor. Thus, those attempts do not appear to trigger the "hot pursuit" exception. Though defendants did not raise this argument, the court's own research discloses that Mr. Dgebuadze's attempts to enter the home could potentially trigger the "hot pursuit" exception if they amounted to "Escape" in violation of Wis. Stat. § 946.42(3)(a), a Class H felony. Yet, the elements of "Escape" would only be satisfied if the officers had probable cause to commence the initial arrest for disorderly conduct,[12] which of course is disputed. At the very least, the "Escape" option prevents the entire "hot pursuit" issue from necessarily turning on the jury's finding as to whether Mr. Dgebuadze tried to hit Officer Feyen. As it stands, in order for the "hot pursuit" exception to apply, the jury would have to conclude either: 1) that Mr. Dgebuadze attempted to hit Officer Feyen outside the garage (thus justifying "hot pursuit" for "Battery of a Peace Officer"); or 2) that Officers Feyen or Grace commenced the arrest outside the garage[13] and that they had probable cause to do so (thus justifying "hot pursuit" for "Escape").

---

[12]Wis. Stat. § 946.42(3)(a), "Escape," requires that the initial arrest, whereby the officers took custody of the suspect, to be a "legal arrest."

[13]"An arrest occurs when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1017 (7th Cir. 2006) ) (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Wis. Stat. § 946.42(3)(a), "Escape," requires that a person first be "in custody" of an officer. However, a person is "in custody" if an arrest, as defined in *Sornberger*, has occurred. *State v. Swanson*, 475 N.W.2d 148, 152 (Wis. 1991) (*abrogated on other grounds State v. Sykes,* 695 N.W.2d 277 (Wis. 2005). Thus, if a reasonable person in Mr. Dgebuadze's position would have understood, outside the garage, the situation to constitute a restraint on freedom of movement to the degree associated with formal arrest, then the officers had probable cause to arrest Mr. Dgebuadze for "Escape" and thus the entry into the garage was permitted under "hot pursuit."

Apart from the "hot pursuit" doctrine, defendants allege the other variant of exigent circumstances that applies is the exception created when entry is necessary to address the risk of danger to the police. Defendants essentially argue that the officers reasonably could have suspected that Mr. Dgebuadze was attempting to retrieve a weapon from inside the home, and thus their actions in entering the home to arrest him were necessary to prevent the risk of danger to the police. (Defs. Reply Br. Supp. Mot. S.J. at 6-7). Defendants cite *State v. Richter*, 612 N.W.2d 29 (Wis. 2000) for the premise that "requir[ing] a police officer . . . to have affirmative evidence of the presence of firearms or known violent tendencies on the part of the suspect before acting . . . is arbitrary and unrealistic and unreasonably handicaps the officer in the performance of his core responsibilities." *Id.* 38-39. This court certainly agrees with that ruling; however, nothing about that ruling substantiates a finding of exigent circumstances at the summary judgment phase in the instant case. A crucial distinction between the instant case and *Richter* is the fact that the facts of the *Richter* case were not in dispute. *Id.* at 32. The facts were than a woman flagged down an officer, told him that a man tried to break into her trailer, she had confronted him, and he had fled and entered another trailer. *Id.* The trailer the suspect entered showed signs of forced entry. *Id.* The officer had not had the opportunity to observe the suspect, nor did he have any idea who owned or lived in the trailer the suspect had entered. *Id.* Indeed, it was certainly reasonable for the officer to believe that the suspect was perhaps armed, and that he had forcefully entered a trailer inhabited by otherwise innocent bystanders. Conversely, the facts

-31-

in the instant case are highly disputed. They may support a finding that the officers reasonably were concerned that Mr. Dgebuadze's actions constituted a threat; however, taken in the light most favorable to plaintiffs, they do not support such a finding. Indeed, the only undisputed fact seems to be that the officers were threatening to arrest anyone who did not go inside the house. Defendants do not even address the seeming inconsistency between this undisputed fact, and the claim that Mr. Dgebuadze's attempts to comply with the order to "go inside" gave rise to exigent circumstances. Accordingly, the court cannot state that the facts, taken in the light most favorable to plaintiffs, support a finding that as a matter of law, Officers Feyen and Grace's actions were justified pursuant to an "exigent circumstances" exception.

### b) Unreasonable Seizure: Fourth Amendment

A Fourth Amendment "seizure" occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989). However, "'[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Id.* at 599. To determine the reasonableness of a "seizure" the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

Plaintiffs allege three different bases for their "unreasonable seizure" claims. These bases are: 1) Officer Feyen knocking plaintiffs down and stepping on Teresa

-32-

Croal's foot; 2) Officer Christensen ordering Teresa Croal to "stay down" and holding her down with his hand; and 3) the officers ordering plaintiffs to go inside their home and remain there. According to plaintiffs, each of these three events constitutes a separate "seizure" for which the applicable defendants are liable.

### i) Knocking Plaintiffs Down; Stepping on Foot: Feyen

Plaintiffs argue that Officer Feyen intentionally knocked them down and stepped on Teresa Croal's foot, and thus his actions constituted a "seizure." (Pls. Br. Opp. Mot. S.J. at 12). Defendants support the majority of their arguments on the assumption that the court will credit the officers' testimony over that of plaintiffs' witnesses and thus find that Officer Feyen's actions were unintentional. (Defs. Br. Supp. Mot. S.J. at 24-25). The court, however, has already made it clear that a reasonable jury could find Officer Feyen's actions in pushing over plaintiffs were intentional. Supra III(B)(2). Furthermore, as plaintiffs point out, "summary judgment is inappropriate where the underlying issue is one of motivation, intent, or some other subjective fact." *Santiago v. Lane*, 894 F.2d 218 (7th Cir. 1990) (*summarizing Connor v. Reinhard*, 847 F.2d 384 (7th Cir.1988)). Thus, defendants' "intentionality" argument is unavailing. Defendants' other argument on the matter, though, is much more persuasive. Defendants point out that even under the facts pled by plaintiffs, plaintiffs' contact with Officer Feyen was over in an instant. Thus, even if they were knocked down, "temporary immobility does not necessarily mean that one's freedom of movement is terminated." (Defs. Reply Supp. Mot. S.J. at 9) (*citing Schaefer v. Goch*, 153 F.3d 793, 796 (7th Cir. 1998)). Indeed, there is no indication from

-33-

plaintiffs' allegations that Officer Feyen's actions in knocking plaintiffs down and stepping on Teresa Croal's foot, even if intentional, actually terminated their freedom of movement. The duration is similar to that in *Schaefer*, where a woman was ordered to the ground, but then got up mere moments later. 153 F.3d at 794-95. The fact that she was able to get up so soon after being "seized" demonstrated that her freedom of movement had not been terminated, thus, she was not "seized." *Id.* at 796-97. Similarly, within literally a second or two after having been contacted by Officer Feyen, plaintiffs were free to move about,[14] thus it cannot be said that Officer Feyen "seized" either of the plaintiffs.

### ii) Ordering and Holding Teresa Croal Down: Christensen

Plaintiffs claim that Officer Christensen seized Teresa Croal when he ordered her to "stay down" and allegedly held her down with his hand. Certainly such action, if true, would constitute a termination of freedom of movement intentionally applied, and thus would be a "seizure." However, as stated above, "'[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Brower*, , 489 U.S. at 599. In "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *Place*, 462 U.S. at 703, the court thinks it evident that the "seizure" was reasonable. The nature and the quality were extremely limited, as Teresa Croal stated that she would have remained where she was even had she not

---

[14]Teresa Croal was not free to move about, but that was not because of Officer Feyen; if it was because of any officer's intentional acts, it was because of Officer Christensen's acts.

been told to "stay down," and that she was unaware that she was being held down. (Sewell Decl., Ex. 12, Teresa Croal Depo. at 33, 50). Certainly the governmental interest – securing the scene for the safety of bystanders and the officers during an ongoing arrest involving the deployment of a Taser – justified the brief and non-invasive "seizure" of Teresa Croal. As this seizure was not unreasonable, it was not a violation of the Fourth Amendment.

### iii) Ordering Plaintiffs to Go and Stay Inside Their Home

Plaintiffs assert that they were seized when they were ordered to go and remain in their home under threat of arrest. (Defs. Br. Opp. Mot. S.J. at 11). Defendants have not advanced any arguments as to why they should be granted summary judgment as to this aspect of plaintiffs' Fourth Amendment claim. However, the court has no interest in imposing unnecessary tasks upon the jury since this claim can be resolved on summary judgment. Based on case law cited by plaintiffs, namely *Duran v. Sirgedas*, 240 Fed. Appx. 104 (7th Cir. 2007), it is evident that a reasonable jury could conclude that the officers seized plaintiffs by ordering them to go in and remain in their house under threat of arrest. *Id.* at 111. Indeed, the Seventh Circuit held as much in *Duran*, a case almost directly on point with this case as to the issue of whether ordering people to get inside a house and remain there supported a Fourth Amendment claim of seizure. In *Duran*, the court held that this seizure was reasonable, based upon a finding that the officers were "confronted with an escalating encounter with some seventy to ninety individuals" at a house party, and the officers tried to control the crowd by ordering partygoers

-35-

inside.  *Id.* at 111.  The court held that though such actions constituted a "seizure,"

such a seizure was eminently reasonable.[15]  *Id.*  Though the officers in the instant

case were not met with such a large crowd, they were certainly confronted with an

escalating situation, there were certainly several people out on the lawn, and – as

the knocking over of the Croals demonstrates – the presence of those extra people

outside constituted an increased risk of an incident occurring.  Thus, ordering the

people into the home, at least until the situation was contained, was reasonable.

Therefore, defendants are entitled to summary judgment on this aspect of plaintiffs'

unreasonable seizure claim, just as defendants are entitled to summary judgment

as to the other two aspects of plaintiffs' unreasonable seizure claim.

### c)      Excessive Force:  Fourth Amendment

"All claims that law enforcement officers have used excessive force . . . in the

course of [a] . . . 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386,

395 (1989).  "The "reasonableness" of a particular use of force must be judged from

the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight."  *Id.* at 396.  Furthermore, the existence of a "seizure" is a

necessary element of an excessive force claim.  *Edward v. Giles*, 51 F.3d 155, 157

(8th Cir. 1995) (*summarizing Cole v. Bone*, 993 F.2d 1328, 1332-33 (8th Cir. 1993)).

---

[15]The only reason the plaintiffs' Fourth Amendment claim was upheld in *Duran* is because the officers sprayed pepper spray into the home.  Thus, the issue was not whether the seizure was reasonable (which it was held to be), but whether the officers used "excessive force" during the seizure.

-36-

Because the court holds that Officer Feyen did not seize either of plaintiffs when he knocked them down and stepped on Teresa Croal, plaintiffs, therefore, cannot maintain an excessive force action against him for that incident. Though the officers did likely seize plaintiffs when they ordered plaintiffs into their home, they did not use any force in doing so, and certainly did not use excessive force in doing so, thus, plaintiffs cannot maintain an excessive force action against the officers for that occurrence either. The only alleged incident that was in fact a "seizure" and that did involve force was Officer Christensen's action of holding Teresa Croal down (if in fact he did do that). This action, however, clearly did not involve excessive force, as Teresa Croal was uninjured by it, and indeed, even unaware of it. The force Officer Christensen employed was objectively reasonable, and certainly reasonable from the perspective of an officer on the scene. Accordingly, the court grants defendants summary judgement as to the entirety of plaintiffs "excessive force" claim.

### d) Substantive Due Process: Fourteenth Amendment

Plaintiffs assert that Officer Feyen violated their substantive due process rights, conferred by the Fourteenth Amendment, when he knocked them down and stepped on Teresa Croal's foot. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). However, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (*quoting Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 129 (1992)). Such conduct must "shock the conscience," *Rochin v. California*, 342 U.S.

-37-

165, 172-73 (1952), which generally means it must be "deliberate action intended to harm another," *Bublitz v. Cottey*, 327 F.3d 485, 491 (7th Cir. 2003). Furthermore, a claim can only be analyzed under "substantive due process" if it is not "covered by" the Fourth Amendment. *County of Sacramento*, 523 U.S. at 843.

As plaintiffs' claim pertaining to Officer Feyen's knocking down of the Croals was not a Fourth Amendment claim since it was not a "seizure," it may be analyzed as a substantive due process claim. Once again, defendants' sole defense is that Officer Feyen unintentionally knocked down the plaintiffs. Just as with plaintiffs' assault and battery claim, the court maintains that if plaintiffs' version of the facts are believed, then a jury could reasonably find that Officer Feyen acted deliberately. Unlike plaintiffs' assault and battery claim though, for plaintiffs to prevail on a substantive due process claim they will have to show that not only did Officer Feyen deliberately push them, but also that he intended to harm them. A reasonable jury could conclude that a police officer who chooses to push over two older individuals (one of whom is 75 years old) does so intending to cause them harm. Accordingly, the court will not enter summary judgement for Officer Feyen on this matter, but will note that he may only be found to have violated plaintiffs' substantive due process rights if the jury were to find: 1) that he intentionally pushed plaintiffs over and/or stepped on Teresa Croal's foot; *and* 2) that he did this with the intent to injure plaintiffs.

### e) Applicability of Qualified Immunity

Defendants claim that the doctrine of qualified immunity shields them from suit for plaintiffs § 1983 claims. "Under the doctrine of qualified immunity, 'governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At the time the parties briefed the summary judgment motion, the standard for determining whether qualified immunity applies was governed by *Saucier v. Katz*, 533 U.S. 194 (2001). *Saucier* states:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.
>
> . . .
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Id.* at 201. Very recently, however, the Supreme Court has receded from *Saucier*, holding that the first step in the inquiry is no longer mandatory, and that district courts may choose to resolve the immunity question first, or even to only resolve the immunity question if it is dispositive. *Pearson v. Callahan*, 129 S.Ct. 808 (2009) (*receding from Saucier*, 533 U.S. 194).

-39-

In the instant case, the immunity question is not dispositive, and thus the court has simply engaged in the standard *Saucier* analysis, as *Pearson* allows district courts to do at their own discretion. 129 S.Ct. at 821. The court's foregoing analysis has shown that, taken in the light most favorable to plaintiffs, the facts alleged support a finding that: 1) Officers Feyen and Grace's conduct violated plaintiffs' Fourth Amendment rights to have their home be free from unreasonable search; and 2) Officer Feyen violated plaintiffs' Fourteenth Amendment substantive due process rights. Now the court must inquire into whether those rights were clearly established at the time the conduct occurred. The "clearly established" inquiry serves to ensure that "before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Thus, even if the officers' actions were unconstitutional, if they violated constitutional rights through a manner that was not clearly established as unconstitutional at the time, the officers would still be entitled to qualified immunity.

In the instant case, the court has stated that Officers Feyen and Grace can be held liable for the warrantless search of plaintiffs' home, if the jury finds that the officers did not have probable cause to arrest Mr. Dgebuadze for a felony prior to entry into the garage *and* that the Officers could not reasonably believe that entry was required to ensure their own protection. These exigent circumstances exceptions to the prohibition against warrantless entries date back decades. *See Minnesota v. Olson*, 495 U.S. 91 (1990). Accordingly, plaintiffs' rights that were

-40-

violated, if neither of these exigent circumstances exceptions applies, were clearly established on July 23, 2006.

The court has also found that Officer Feyen may be held liable for the deprivation of plaintiffs' substantive due process rights if the jury concludes that Officer Feyen deliberately pushed plaintiffs down and/or deliberately stepped on Teresa Croal's foot, and that Officer Feyen did these acts with the intent to injure plaintiffs. Conduct that is "so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency" has been held to violate substantive due process for decades as well. *County of Sacramento*, 523 U.S. at 847 (*summarizing Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). Thus, plaintiffs' rights that were violated, if Officer Feyen did intentionally batter plaintiffs with the intent to harm them, were clearly established on July 23, 2006.

### 7. Plaintiffs Sixth Claim: Conspiracy

Plaintiffs' complaint alleges a "conspiracy" claim against the individual officers as well as the City of Waukesha and the City of Waukesha Police Department. (Compl. ¶ 45). Plaintiffs' "conspiracy" claim is based on 42 U.S.C. § 1983 and § 1985. Though plaintiffs assert this claim in their complaint, they state in their brief that they do not oppose summary judgment as to their conspiracy claim because, though the claim was made in good faith, they do not now believe there are sufficient facts to support the claim. (Pls. Br. Opp. Mot. S.J. at 27 n.12). Accordingly, the court grants defendants summary judgment as to the entirety of plaintiffs' sixth claim.

-41-

## III.    CONCLUSION[16]

The court denies defendants' motion to strike the affidavit of Mr. Dgebuadze. Thus, plaintiffs may rely on his affidavit as support to oppose defendants' motion for summary judgment. Nonetheless, of the several claims asserted against the three individual defendants and the two institutional defendants' named in the complaint, few of the claims survive defendants' motion for summary judgment. Even fewer defendants remain. As explained above, of plaintiffs' state tort law claims, only the assault and battery claim against Officer Feyen, and the trespass claims against Officers Feyen and Grace, remain. Of the § 1983 claims, only the Fourth Amendment unreasonable search claim against Officers Feyen and Grace, and the Fourteenth Amendment substantive due process claim against Officer Feyen, remain. The City of Waukesha, the City of Waukesha Police Department, and Officer Christensen are also dismissed from this action. Finally, the court considered plaintiffs' motion to strike defendants' reply to plaintiffs' response to defendants' proposed findings of fact; however, as the filing that plaintiffs were seeking to be struck did not contain any substantive information additional to the defendants' unchallenged filings, the court finds the issue moot.

Accordingly

---

[16]The seventh claim in plaintiffs' complaint is a claim for the imposition of punitive damages. Defendants' briefs make no reference to this claim, and indeed, it is an issue more appropriately dealt with at the time of trial. Suffice it to say that in § 1983 cases, "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." *Smith v. Wade*, 461 U.S. 30, 51 (1983).

-42-

**IT IS ORDERED** that defendants' Motion to Strike (Docket #38) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment (Docket #13) be and the same is hereby **GRANTED** in part, and **DENIED** in part, consistent with the ruling herein;

**IT IS FURTHER ORDERED** that the City of Waukesha, the City of Waukesha Police Department, and Officer Christensen be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that plaintiffs' 7.4 Motion to Strike (Docket #45) be and the same is hereby **DENIED** as moot.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:07-cv-00837-JPS   Filed 03/31/09   Page 43 of 43   Document 51